UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| DOROTHY YVONNE COLLINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:10-CV-00151-BG |
| | ) | ECF |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**Statement of the Case**

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Dorothy Yvonne Collins seeks judicial review of a decision of the Commissioner of Social Security denying her application for disability insurance benefits and supplemental security income. The United States District Judge transferred this case to the United States Magistrate Judge for further proceedings. Collins did not consent to proceed before the United States Magistrate Judge, and therefore the undersigned now files this Report and Recommendation.

An Administrative Law Judge (ALJ) held a hearing on April 23, 2009, and determined on August 5, 2009, that Collins was not disabled. As relevant here, the ALJ held that Collins did not have a combination of impairments that met or equaled in severity any impairment listed in the regulations governing Social Security claims, including Listing 12.05 for mental retardation. The Appeals Council denied review on August 27, 2010. Therefore, the ALJ's decision is the Commissioner's final decision and properly before the court for review. *See Higginbotham v.*

*Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (holding that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

### Factual Background

Collins was born on June 21, 1961. (Tr. 129.) She took special education classes in high school, graduated on May 27, 1980, and received no additional formal education. (Tr. 140, 478.) From 1991 to 2007, she worked as a childcare worker, cook, and elderly care worker. (Tr. 142.) Collins reported that as a childcare worker she fed, helped potty train, taught, entertained, and played with children; cleaned, mopped, swept, and washed clothes; and wrote or completed reports. (Tr. 143.) She further reported that as a cook she supervised three people, hired and fired employees, cooked, cleaned, prepared meals, read recipes, used machines and equipment, and wrote or completed reports. (Tr. 144–45.) Finally, she reported that as an elderly care worker she bathed, dressed, and cooked for her client and assisted her with bathing and grooming needs. (Tr. 145.)

Collins claims that she became disabled on October 11, 2007, due to a history of knee problems, asthma, and depression dating as far back as 1999. (Tr. 129, 134, 191–93.) On November 13, 2007, clinical psychologist William E. Hoke, Ph.D. examined Collins to assess her intellectual functioning, academic abilities, and personality functioning. (Tr. 203–12.) According to Dr. Hoke, Collins reported that she took special education classes in high school due to her "significant difficulty with reading." (Tr. 203.) Dr. Hoke noted that Collins had a driver's license, could drive, had a vehicle, and worked in elderly care on weekends after being fired from her job at a daycare on October 10, 2007, because she allegedly left a two-year-old child outside alone for fifteen minutes. (Tr. 204.) According to Dr. Hoke, Collins reported that she had been depressed since 2000 and previously took medication that helped, but she stopped taking the medication in 2003. *Id.*

2

Dr. Hoke found that Collins displayed normal psychomotor activity; appropriate behavior and persistence; and good attitude, motivation, interest, effort, attention, and concentration. (Tr. 205.) He further reported that Collins's energy levels were within normal limits despite reported suicidal thoughts, phobia about looking for a job, insomnia, and decreased appetite. *Id.* In addition, he found that Collins had logical thought processes and appropriate thought content. *Id.* He further found that she could perform very basic math, but she could not interpret simple proverbs (e.g., "Don't cry over spilled milk"). *Id.* Dr. Hoke concluded that Collins's overall levels of intelligence, judgment, and insight appeared to be "significantly impaired." *Id.*

Upon formal intelligence testing by Dr. Hoke, Collins achieved a full scale IQ of 70, which demonstrated borderline intellectual functioning. (Tr. 206.) Specifically, Dr. Hoke reported that Collins was functioning at or below fourth grade level in all academic areas. (Tr. 207.) He also found Collins to be "functioning within the average range of general intellectual ability and [apparently] capable of dealing with moderately complex problems and decisions, particularly when they relate directly to her experience and training." (Tr. 209.) In addition, he noted that Collins lacked confidence and might "become emotional in response to difficulties[,] and others are likely to see her as nervous, moody, or unhappy." *Id.* He concluded that Collins was not being sufficiently treated for her depression and recommended a psychiatric consultation for antidepressant medication, individual counseling, and job retraining. (Tr. 211.)

On December 12, 2007, a psychologist interviewed Collins to authorize her for mental health services. (Tr. 229–30.) Collins was diagnosed with severe, recurrent major depressive disorder without psychotic features and borderline intellectual functioning. (Tr. 229.) According to the psychologist, Collins reported that she attended a special education program in high school due to

3

a learning disability. (Tr. 230.)

On January 24, 2008, treating psychiatrist Tariq Saleem, M.D. examined Collins, who had been taking prescribed antidepressant medication. (Tr. 215.) Dr. Saleem found that Collins seemed "a lot better . . . than Borderline Intellectual Functioning diagnosed at the screening meeting." *Id.* Dr. Saleem recommended that Collins continue her medications as prescribed and follow up in three months. *Id.*

With the assistance of a caseworker, Collins submitted two daily activity questionnaires in connection with her application for benefits on February 26, 2008. (Tr. 152–59.) She reported that she was receiving treatment for major depressive disorder and did housekeeping and babysat her grandchildren on an average day. (Tr. 152–53.) She further reported that she had no problems taking care of her personal needs and did not require help to prepare her meals. (Tr. 153.) In addition, she stated that she had a driver's license and drove her mother's car. (Tr. 154.) Collins also reported that she could leave home alone and occasionally went to movies but was having problems with concentration, finishing things on time, and handling changes in her routine. (Tr. 155–56.) In addition, she stated that she experienced daily problems from prior knee surgery, headaches, and asthma. (Tr. 157.) She reported that she walked for exercise and that sitting for extended periods and stress exacerbated her physical problems. (Tr. 157–58.) According to Collins, her physical problems limited her ability to sit, stand, walk, lift, carry, kneel, and climb; but they did not limit her ability to drive a car, read a newspaper, watch television, use the phone, or do housework or yard work. (Tr. 158.)

On April 2, 2008, a psychologist evaluated Collins to determine whether she was eligible for mental retardation services under state law. (Tr. 316–22.) The psychologist found that Collins's

4

full scale IQ score of 70 technically met the Diagnostic and Statistical Manual (DSM-IV) definition for mild mental retardation but was one point higher than the score required to receive services under state law. (Tr. 318, 321.) The psychologist reported that Collins was cooperative and friendly and demonstrated appropriate demeanor, mood, and social behaviors with normal affect and no signs of unusual or inappropriate movements. (Tr. 317–18.) The psychologist also found that Collins's thought processes were linear and coherent, and he noted no significant problems with her receptive and expressive language abilities. (Tr. 318.) According to the psychologist, Collins reported that she began to receive special education services in seventh grade but stayed in mainstream classes for physical education, art, and music. (Tr. 317.) Collins also reported that on a typical day she would clean her house and help take care of her grandsons and an elderly friend. *Id.* The psychologist concluded that Collins was functioning at the upper level of mild mental retardation and that she "had significant difficulties with cognitive abilities early in formal schooling, which [fell] clearly within the developmental period." (Tr. 321.) The psychologist also concluded that Collins's adaptive functioning was within the normal range and indicated a need for infrequent or no assistance in independent living despite deficits in some areas. (Tr. 320.)

Dwight Hood, M.D. examined Collins on April 9, 2008, for complaints of asthma and knee pain and instability from an injury in 1996. (Tr. 243–46.) According to Dr. Hood, Collins also reported loss of appetite, hematuria, headache, depression, and insomnia. (Tr. 243.) Dr. Hood found that Collins displayed an appropriate mood and affect and was alert, oriented, cooperative, and in no acute distress. (Tr. 245.) Dr. Hood also found that she had normal range of motion in all extremities except for the right knee and a normal gait. *Id.* In addition, Dr. Hood reported that Collins could stand and walk up to fifteen yards before developing knee pain. *Id.* Franklin Graham,

5

M.D. reviewed x-rays of Collins's right knee and found mild degenerative joint disease. (Tr. 247–48.)

On April 17, 2008, psychologist Robert B.White, Ph.D. reviewed Collins's medical records and determined that she did not meet Listing 12.04 for affective disorders or Listing 12.05 for mental retardation in the regulations governing Social Security claims. (Tr. 251–64.) Dr. White found that Collins's major depressive disorder and borderline intellectual functioning were medically determinable impairments that did not precisely satisfy the diagnostic criteria of listing 12.04 or 12.05. (Tr. 254–55.) Dr. White further reported that Collins was mildly limited in activities of daily living and moderately limited in maintaining social functioning, concentration, persistence, and pace as a result of these impairments. (Tr. 261.) He also reported that she had experienced approximately two episodes of decompensation of extended duration. *Id.* Dr. White noted that Collins had been able to engage in substantial gainful activity as a daycare worker since she first experienced her psychiatric symptoms in 1999. (Tr. 263.) He also relied on records indicating that she had an excellent fund of knowledge and was stable on medication and that her activities of daily living were essentially within normal limits. *Id.* Dr. White also assessed Collins's mental residual functional capacity (RFC). (Tr. 265–68.) According to Dr. White, Collins could understand, remember, and carry out simple instructions; make simple decisions; concentrate for extended periods; interact with others; respond to changes in a work setting; and perform simple and repetitive tasks. (Tr. 267.) Dr. White further found that Collins's alleged limitations were not supported by evidence. *Id.* On July 22, 2008, psychologist Norvin Curtis, Ph.D. reviewed Collins's medical records and affirmed Dr. White's findings. (Tr. 365.)

John Durfor, M.D. assessed Collins's physical RFC on April 18, 2008. (Tr. 269–76.) Dr.

Durfor found that Collins could occasionally lift fifty pounds, frequently lift twenty-five pounds, push and pull without limitation, and sit, stand, or walk for about six hours in an eight-hour workday. (Tr. 270.) He also found that Collins's allegations were not fully supported by the evidence of record. (Tr. 276.) On July 29, 2008, Bob Dodd, M.D. reviewed Collins's medical records and affirmed Dr. Durfor's findings. (Tr. 366.)

On June 5, 2008, a caseworker met with Collins to assess her progress. (Tr. 302–08.) According to the caseworker, Collins was quiet and cooperative and reported that she was eating and sleeping well. (Tr. 303, 306.) Dr. Saleem also met with Collins and indicated that she was doing very well on her medications. (Tr. 309.)

Collins submitted a function report in connection with her application for benefits on July 14, 2008. (Tr. 176–83.) When asked what she did from the time she woke up to the time she went to bed, she reported that she took her medicine and then took her grandchildren home if they had spent the night. (Tr. 176.) She stated that she then cleaned, read a book, watched television, visited a friend, or went to the store for her mother before going to bed. *Id.* Collins reported that she did not want to be around people and did not get much sleep due to her conditions. (Tr. 177.) She stated that she had difficulties dressing and bathing herself because she would get out of breath. *Id.* She also stated that she sometimes needed reminders to take a bath and take her medicine. (Tr. 178.) According to Collins, she sometimes would not eat for up to two days, but she could prepare her own meals and ironed and cleaned her house with her mother's help. *Id.* She also reported that she could go out alone and did so up to two times per day by walking or driving herself. (Tr. 179.) She further stated that she could shop and pay bills by herself but could not count change very well. *Id.* In addition, Collins reported that she read once a day but not well and watched television whenever

she could.  (Tr. 180.)

On August 7, 2008, Edwin Joe Sasin, M.D. examined Collins at the emergency room for complaints of wheezing, nausea, vomiting, and chills. (Tr. 368–75.) According to Dr. Sasin, Collins did not have any pain or swelling in her muscles and joints.  (Tr. 370.)  Joanne Chung, M.D. reviewed a chest x-ray and noted slight scoliosis of the thoracic spine but no other abnormalities. (Tr. 376–77.) Collins was diagnosed with a UTI, anemia, and a history of asthma, and she improved after receiving medication (Tr. 373.)  She was discharged in stable condition.  *Id.*

Treating psychiatrist Dr. Saleem examined Collins on September 16, 2008, and found that she was "well stabilized."  (Tr. 406.)  Dr. Saleem noted that Collins was well-behaved and quiet during the exam, and he recommended that she continue on her prescriptions.  *Id.*  At another appointment on April 2, 2009, Dr. Saleem noted that Collins reported emotional problems due to the release of her nephew from prison.  (Tr. 474.)  Dr. Saleem altered Collins's prescriptions to "keep up with" her symptoms.  *Id.*

On April 23, 2009, Collins was represented by counsel and testified at a hearing before the ALJ.  (Tr. 8–22.)  The ALJ held a supplemental hearing on May 19, 2009, to question a vocational expert regarding Collins's claim.  (Tr. 23–28.)  Collins's counsel also questioned the vocational expert.  (Tr. 27–28.)

**Standard of Review**

A plaintiff is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (2011).

8

"In evaluating a disability claim, the Commissioner conducts a five-step sequential analysis to determine whether (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2011). "The claimant bears the burden of showing she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. Before proceeding to steps 4 and 5, the Commissioner must assess a claimant's RFC, defined as "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 404.1520(a)(4)(iv)-(v), 416.945(a)(1), 416.920(a)(4)(iv)-(v).

Judicial review of a decision by the Commissioner is limited to two inquiries: a court must "consider only whether the Commissioner applied the proper legal standards and whether substantial evidence in the record supports the decision to deny benefits." *Audler*, 501 F.3d at 447; 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"). "Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990).

9

**Discussion**

A claimant is disabled if she has an impairment that meets or is equal in severity to an impairment listed in Appendix 1 of the regulations governing Social Security claims. 20 C.F.R. §§ 404.1520(d), 416.920(d). To meet a listing in Appendix 1, an impairment "must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990) (italics in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* Similarly, to equal a listing a claimant "must provide medical findings that support each of the criteria for the equivalent impairment determination." *Selders*, 914 F.2d at 619.

Collins argues that she has an impairment that meets or equals the following two criteria of Listing 12.05 for mental retardation:

> 1. Significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested before age 22 ("first requirement") and
>
> 2. A valid full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

(Pl.'s Br. 14–18); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Adaptive activities relevant to the first requirement include "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [a claimant's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). In *Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009), an ALJ relied on findings of clinical psychologists based on testing performed when the claimant was thirty-nine years old to conclude that the claimant did not satisfy the first requirement. *Id.* at 653–54. The Court of Appeals

for the Fifth Circuit held that the substantial evidence supported that conclusion because the ALJ was entitled to rely on the psychologists' findings that the claimant "suffered from only 'mild/borderline' adaptive retardation and that her mental impairments 'would not preclude gainful competitive employment.'" *Id.* at 662.

In the instant case, Collins's work history and activities of daily living support the ALJ's conclusion that Collins does not meet the first requirement of Listing 12.05. Collins reported that she regularly did housekeeping, cared for her grandchildren and an elderly neighbor, read, prepared meals, took care of her personal needs including dressing and bathing, drove, shopped for her mother, and went out alone up to two times per day. (Tr. 152–59, 175–80, 317.) She also shopped and paid bills by herself. (Tr. 179.) In addition and as noted by the ALJ, Collins successfully worked for years despite her reported intellectual deficits, and she reported that her jobs included activities identified in the regulations as adaptive, including cleaning and cooking for others. (Tr. 42, 143–45.)

The findings of treating and consulting mental health professionals also support the ALJ's conclusion. As noted by the ALJ, Dr. Hoke concluded on November 13, 2007, that Collins was "functioning within the average range of general intellectual ability and [apparently] capable of dealing with moderately complex problems and decisions, particularly when they relate directly to her experience and training." (Tr. 38, 209.) The ALJ also noted Dr. Hoke's finding that Collins could perform basic math and had logical thought processes and appropriate thought content. (Tr. 38, 205.) As also noted by the ALJ, Dr. Hoke recommended job training, indicating his belief that Collins's mental capabilities did not preclude her from gainful employment. (Tr. 38, 211.) In addition, the ALJ noted the finding of treating psychiatrist Dr. Saleem that Collins seemed "a lot

better . . . than Borderline Intellectual Functioning" after she started taking medication. (Tr. 39, 215.) Another consulting psychologist concluded that Collins was functioning at the upper level of mild mental retardation. (Tr. 321.) Notably, that psychologist also concluded that Collins's adaptive functioning was within the normal range. (Tr. 320.) Additionally, he found that she demonstrated appropriate demeanor, mood, and social behaviors; normal affect; linear and coherent thought processes; no signs of unusual or inappropriate movements; and no significant problems with her receptive and expressive language abilities. (Tr. 317–18.)

The findings from Collins' treating and consulting mental health professionals are similar to the findings of the clinical psychologists in *Randall*. Accordingly, the ALJ in this case was entitled to rely on those findings to conclude that Collins did not exhibit deficits in adaptive functioning sufficient to meet the first requirement of Listing 12.05. *Randall*, 570 F.3d at 662. As also noted by the ALJ, consulting psychologists Dr. White and Dr. Curtis reached the same conclusion. (Tr. 40–41, 251–64, 365.)

For the foregoing reasons, substantial evidence supports the ALJ's finding that Collins does not meet or equal Listing 12.05.

## Conclusion

For the foregoing reasons, the undersigned recommends that the United States District Court affirm the Commissioner's decision and **DISMISS** Collins's complaint with prejudice.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2011); Fed. R. Civ. P. 72(b). To be specific, an objection must identify the specific

finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: October 31, 2011.

NANCY M. KOENIG
United States Magistrate Judge